I represent one of the three appellants, Jaime Rosales. I represented Mr. Rosales in the district court as well. I will take not more than five minutes to address the claims that Rosales has made in his direct appeal. Counsel for Brooks and counsel for Ruiz will take approximately five minutes apiece to answer matters raised in their appeals. Unless the other two appellants, they will not be responding to the government's argument. I will reserve hopefully five minutes to address the issues regarding the sentence which are presented by the government's cross-appeal. The government presented a circumstantial, inferential, and wholly, if we submit, speculative case as to Jaime Rosales. We acknowledge that they did present enough evidence to permit a reasonable juror to go part of the way down the path that they sought to follow. We agree that the evidence supported Rosales' conviction on count six involving distribution of an unspecified amount of cocaine and on count one involving conspiracy to distribute an unspecified amount of cocaine. The key issue here is the weight of the cocaine for which Rosales should be held responsible. Whether the government presented enough evidence from which the jury could infer beyond a reasonable doubt that the amount was more than 500 grams. The jury was a huge hydraulic press? A hydraulic press that could be used for various purposes with no proof that it was ever used for drug compaction and the key portion of that press locked in a safe to which Rosales was not shown to have access. It was in his apartment, right? It was an apartment that he had moved into a week or two earlier at the request of Brooks, who was trying to shuffle people around after Ruiz had been arrested for domestic violence and was subject to a no-contact order with his girlfriend. What about the 580 grams seized from Brooks and an additional 250 grams seized from Brooks? They were seized from Brooks. That, in our view, is the important factor. There was no proof. So the ability is the test, right? That's correct. And Brooks was charged with conspiring to import heroin and cocaine. Rosales was not Brooks' only source. There was no evidence that Brooks did not have other sources from which he could obtain cocaine. What else could the hydraulic press have been used for? Well, it can be used in metallurgical applications, in stamping, generally in an industrial setting. And you think the jury was unreasonable in concluding that that wasn't what it was used for? I think the jury did not have enough evidence to make a finding that Rosales knew what it was used for and why it was there, or that it was ever used for that purpose. Nobody said that press was used for any drug-related purpose. Remember Gomez, who was one of the government's early witnesses from the New York aspect, testified that he was in that apartment for a week or so, boiling jackets or hammocks to get drugs out of them, and the press was there then. It wasn't used then. It wasn't used at any time after that, per the evidence in the record. This is a conspiracy, right? That's correct, Your Honor. Okay, so... And we acknowledge that there was sufficient evidence to make Rosales guilty on count one. We're contesting the finding. Okay, putting the press aside, I'm still not clear why it's not foreseeable, given that they actually found Brooks with those quantities at the date of the conspiracy, which themselves exceeded the 500 grams, why the jury couldn't say it was foreseeable that when you draw in that kind of conspiracy that the volume over the course of the conspiracy would exceed 500 grams? I just don't think that you can sprinkle reasonable inference over these separate facts and say, well, the jury could have inferred this. When those drugs were found... I'm sorry, you just said you don't think so, but that doesn't tell me why... Well, our reason is that my client's entitled to the presumption of innocence, and the government has the burden of proving that... He is entitled to presumption of innocence, and it attaches until the point of conviction. Okay? And the government has certain burdens. One of the things that has a burden to prove is your client's connection to the crime, and they can do it in various ways. One of them, they could show that, in fact, he was in possession or that he somehow was a bond of possession. But another way of doing it is by showing that he was a member of the conspiracy, the conspiracy itself, one of the conspirators moved enough drugs, and that it was foreseeable. For your client to know that, when he joined the conspiracy, they would move that kind of quantity. He need not know about these specific drugs. Indeed, he need not know about any specific drugs. He only needs to know that the conspiracy... He needs to know enough facts to show that it's foreseeable that the conspiracy would move that kind of drugs. Am I mistaken about any of what I said? No, Your Honor. But if you're going to impose a mandatory minimum, you have to find that the defendant in question could reasonably foresee the weight. That's in the Banuelos case that Your Honor wrote. That's exactly right. And my time is up for this portion of my argument. Do you dispute that he, in a phone conversation, used the term half a kilo? On May 23rd. I don't dispute that. Okay, so he was thinking in terms of at least 500 grams. He used that term. Was that in furtherance of this conspiracy? That's my point. That's my answer to that, Your Honor. That you can't just say anything Rosales did in his drug activity, if he did other things, is part of this conspiracy that he was charged with. And I've now used seven of my five minutes. May it please the Court. I'm Lynell Nussbaum, representing Alfonso Brooks. I'd like to use my few minutes to address the vouching issue and present the other issues to the Court on the briefs. We'd ask this Court to reverse all of the counts against Mr. Brooks, except counts 15, 17, and 18, because of the improper vouching evidence that the government presented in this case. Wait. Say that again. What counts? All except counts 15, 17, and 18, which were the counts based on the evidence found at his home in Covington. The evidence was presented largely without objection. I want to you're addressing the vouching issue. And one of my questions for you was, does, I'm not sure the vouching issue goes through counts 12 through 18. Your Honor, I believe it does, because the vouching issue. Let me just make sure I'm understanding what you're saying. You're saying the vouching error affects everything except 15, 17, and 18? Yes, Your Honor. Understood. My analysis was that it affected 12, everything except 12 through 18. So part of my question is, what about 12, 13, 14, 16? And part of that issue is that the 12 through, those counts are based on what the government said was Mr. Brooks' local distribution network. And I believe the government itself said in its brief that they learned of this network based on the phone wire tap, phone, intercepted phone calls. And because of the procedure, that that was all One was the authorization and approval received to get the wire tap authorization. On the one where it sounds pretty outrageous, where they ask him if he was found to be truthful in another case, the objection that was made was speculation. That's correct. Are you arguing that that's sufficient to take this out of plain error? No, Your Honor, I'm not arguing that. Okay. So we still review it under? We still review it under plain error, and I believe it is plain error because this evidence combined, the two different kinds of vouching evidence, both the authorizations for the wire tap as well as the co-defendants' cooperations and plea agreements combined permeated this trial. And they went to all other What if you isolate out the plea agreement elaborations and just focus on that testimony about the prior testimony having been found truthful by the judge? I believe that is Would you win on that alone? I believe we would win on that alone, Your Honor, because that was done with three different witnesses, similar testimony, similar evidence, that all three of those cooperating witnesses. However, not all three of those witnesses were involved in all of the counts. So that analysis shifts a bit. Those witnesses that were involved in the New York process and not necessarily in the local distribution, but the local distribution was based on the intercepted phone calls. The evidence regarding getting authorization for the wire taps was that all the officers put together a hundred-page affidavit that included all the evidence they'd amassed so far, that they had approval from high-level U.S. attorneys, high-level DEA agents, and then a Federal judge, which they said was just like the judge in this case, and later they said the Federal judge assigned to this case approved this evidence as evidence of criminal activity in order to authorize  There was no objection made, Your Honor. And hence, no chance for a curative instruction or a limited instruction That is correct, Your Honor. or an instruction that the evidence be stuck and disregarded by the jury, or that it be limited in scope, or anything of that sort. All the things that might have mitigated the effects of this. That's correct, Your Honor. But in United States v. Smith, cited in our brief, where the prosecutor vouched for the witness on behalf of the court, as here it said the court had authorized or had approved this evidence, it was found to be plain error. And in Combs, where the agent, the prosecutor argued that the agent would be prosecuted for perjury, it was found to be plain error and require reversal. But plain error analysis is notoriously fact-specific and case-specific. Yes, Your Honor. And so the fact that plain error is found in other cases is not particularly helpful. In those cases Why is it plain error in this case? It's plain error And particularly the last prong of plain error, the fourth requirement about the integrity of the proceedings and calling the reputation of the judiciary into question and all that. Your Honor, I believe the Cunningham case shows that all practically a script for the testimony here. That was not plain error. But the Gaston case and the Combs as well as Smith was plain error because when the government seeks to put layer upon layer of irrelevant evidence, the obvious purpose for presenting this evidence was to show the jury that these phone calls that the government had intercepted had already been approved as criminal activity. These intercepted phone calls were in code and themselves are, at best, circumstantial, suspicious evidence of something going on, but are not proof beyond a reasonable doubt. For the jury to doubt that these phone calls were, in fact, evidence of drug activity, they would have to contradict what was already professional judgment of high-level government agents, Department of Justice agents, and, in fact, a Federal judge just like the trial judge in this case. We believe that does affect the integrity of the judicial process, that the prosecution would present such evidence, especially to the degree it did so in this case. And if the Court has no further questions, I'll proceed to my co-counsel. Thank you. May it please the Court. My name is Carol Iluski, and I represent Mr. Ruiz in this case. In Mr. Ruiz's case, the Court imposed a 97-month sentence for reasons having nothing to do with the sentencing factors of 3553A. Instead, the 97-month sentence was imposed basically on an essentially arbitrary recommendation of the government that it be 97 months. The recommendation arose from the fact that the defendant, Mr. Ruiz, declined to jump through the technical hoop of offering a proffer to the government. When this technical hoop was in no way relevant — When you call it technical, you make it sound so trivial. But when we make it sound a hoop, you make it sound like it's useless. But, in fact, that's what is required. In fact, yes. The government would have liked Mr. Ruiz to give a proffer. And the government does have an interest in getting defendants to give a proffer. Do you think the government gives too much credit for such a proffer? In this case, it was just two points of a downward adjustment to his base offense level. Usually, they invoke the safety valve and go below the statutory minimum. There was no question here of going below the statutory minimum. But what I think this Court needs to do is separate out the government's role and function from the court's role and function. Yes, the government has an interest in getting defendants to cooperate or do particular things, but the court's role after Booker is different. It's not aligned with just enforcing the guidelines, because I think the guidelines do assist the government in getting the defendants to do what they ask. But the court is charged solely with following the mandate of 3553A. And that has nothing to do with whether or not the government's able to get somebody to cooperate. In fact, the primary provision of 3553A focuses on that. Well, what do we do with it? The guidelines give two points for doing this. Courts can't ignore that.  And what happens is that if she wants the two points, she has to make a proffer. And now the court can depart or vary from the guideline sentence in various ways, but it's quite clear from our case law that the court must accurately calculate the guideline sentence. Yes, Your Honor. Okay. And if the defendant doesn't qualify for the extra two points, the court can very well say, well, you qualify anyway. Yes, Your Honor. And that's why I'm not raising a guidelines issue. I'm raising a 3553A issue. I'm not saying that the guidelines were incorrectly calculated. I'm saying that when the government stood up before the court and said, Your Honor, we're recommending 97 months, but we would have recommended 78 had he given this proffer. And then the court says, okay, I'm going to impose 97 months. But, Mr. Ruiz, I don't understand why you didn't take advantage of this proffer. Only you know that. Now, you just mentioned 97 and 78. That's right. Ironically, you end up kind of arguing that the government gives too much credit for a proffer because you're suggesting that on a reasonable analysis, it's not fair that he be getting all that extra time. But the converse really is, on a reasonable analysis, he gets all that time off. If he gives the proffer. I'm not actually arguing that it was unfair. I'm arguing that the record shows that the judge would have given the lower sentence. The record shows that the judge believed that 78 months would have been a sufficient sentence had the proffer happened. Well, it shows us that the judge said, look, I have to calculate the guideline sentence. And if I had come up with a different guideline sentence, I might have given a different sentence in there. And I'm surprised that you didn't take advantage of the opportunity to bring that guidelines number down some. I think if the judge had done anything else, he would have been abusing his discretion. Do you think when Rita and Claiborne get heard by the Supreme Court, they might be shedding any light on this? I have actually looked at the briefs in those cases, and they do address this parsimony provision. Both sides are arguing what effect the parsimony provision has. As you know, there aren't a lot of cases on this provision. It's kind of a strong language, you know, sufficient but no greater than necessary, but it's kind of fuzzy to enforce. But I think whatever the Supreme Court does, it won't interfere what this Court does, because if this Court finds a clear violation of the parsimony provision, the Supreme Court's deciding what the scope of reasonableness review is, and there's no way that a clear violation of the parsimony provision could be seen as reasonable. What if this Court finds no clear violation? Might Rita and Claiborne educate us on that? If this Court finds no clear violation, then yes. Then the scope of reasonableness review would be relevant. Okay. You wish to say the remainder of the time? Thank you. We'll hear from the government. May it please the Court. My name is Todd Greenberg. I'm an assistant United States attorney here in Seattle. I plan to reserve two minutes for rebuttal with respect to the government's cross-examination. Let me first address the vouching argument put forth by Defendant Brooks. I think this Court can nail on the head by noting that, as to all of the vouching, alleged vouching, there was never an objection. Is it alleged or is it really vouching? Your Honor, we concede that the question that Your Honor was discussing that went to one witness, Mr. Soriano, with respect to his prior cooperation, was vouching. And we conceded that in our brief. But that was not objected to on the basis of vouching. And none of the other alleged vouching was objected to. Well, let me stop you there. When you say it was vouching, there's the issue of whether you're saying it's erroneous vouching or vouching that doesn't rise to erroneous. And you're saying it's vouching that doesn't rise to erroneous, correct? Your Honor, what I'm saying, and I think the ultimate issue before this Court, is that that vouching and none of the other alleged vouching arises to the level of plain error. Okay. Here's my point. I commend the government for being so frank in conceding that the testimony may constitute error. My view is if that constitutes, may constitute error, and you have all this other, through a cumulative effect, the word, important word there is cumulative, when you're conceding, well, this, then there is all this other that forms a cumulative effect. And I think that's an appropriate inquiry, Your Honor. Let me point out that our concession relates to one question in the course of a month-long trial. And standing alone, you might survive on that. But with all the other, the cumulative effect. And, Your Honor, even taking this all cumulatively, I don't think it's even close to a plain error standard on this record, because it is so fact-specific. The facts in this case, the facts of guilt as to each of the defendants that went to trial, but especially as to Defendant Brooks, were overwhelming.  And yes, there was some coded talk, but when the defendants, Rosales and Brooks, used the term, half a kilo, I think the jury can make a reasonable inference on their own. There was also expert testimony concerning drug code. Now, that's all separate and apart from any interpretation that the cooperating witnesses may have given during their testimony. There was testimony about the extensive surveillance of all these drug deals. There were the drug seizures that were talked about earlier with counsel. Substantial drug seizures from Mr. Brooks directly and from his co-conspirators. And let me give one example of why none of this could be plain error. And that is the seizures that took place at the airport, at O'Hare Airport in Chicago. There were a series of phone calls where Alfonso Brooks designated and sent David Thomas and a woman, Deborah Kerwin, to South America to pick up drugs for him. And these calls were introduced. They were very explicit. Between Brooks and Thomas and between Brooks and the co-conspirator in Columbia. They then went to South America. Calls back and forth between Brooks and Hinao in Columbia about meeting up at the hotel. They then confirmed, okay, they met up at the hotel. They have the stuff. Then Thomas and Kerwin fly into Chicago and randomly get searched and they found two kilos, almost two kilos of heroin at the airport. Setting aside Thomas' testimony at trial, there were then a number of calls between Brooks and Hinao in Columbia all about the seizure, about how Kerwin was talking, about how their drugs were seized. Now, that evidence alone would be enough, without any other testimony, would be enough to convict Brooks, and a 10-year mandatory minimum is more than established by those two kilograms of heroin. But that gets to the question I was addressing with defense counsel, and that is, she was conceding, if I was understanding her correct, that counts 15, 17, and 18 would not be affected by vouching. I was wondering whether it should be broader, counts 12 through 18. Do you have a calculus as to which of the counts would be affected by vouching as you're now talking about, some counts relating to the airport scenario? Yes, Your Honor, I do. In my opinion, it's this. Counts 5 and 6 would be wholly unaffected by vouching. Those are the counts involving Defendant Rosales. There was no cooperation, no cooperators testified about those counts. Those were based on surveillance and wiretap evidence. Then we have count 7 is the seizure in Chicago. Now, on one hand, David Thomas, who is one of the cooperating witnesses, he did testify about that count. But my point that I was making earlier is, throw out his testimony if you wish. The phone calls and the seizure of the heroin are more than enough to have convicted Defendant Brooks. We would have put forth that evidence, and I feel very confident about our chances at trial had we not had Thomas as a witness. So I don't think count 7 is affected by the vouching. Counts 8, 9, and 10, again, totally unaffected by any of the alleged vouching. These were seizures from Defendant Ruiz on July 12th at his apartment. The evidence was wiretap calls and the seizures. No cooperator testimony at all. Count, actually all the remaining counts of the indictment from 11 on up, they were either based solely on wiretap evidence or drug seizures, some of which the Defendant Brooks is now conceding. So I think the only counts that we're talking about that the testimony of these witnesses went to are 1 through 4. And those are essentially the conspiracy counts and counts regarding the importation and exportation of heroin. But that's it. So it's a very limited, the vouching goes to a very limited aspect of the case. And it would be more relevant had this independent evidence not been able to establish the 10-year mandatory minimum. But, in fact, just that one day in Chicago is double the amount necessary to establish a 10-year mandatory minimum. So on plain error on that alone, I just don't think it can rise to plain error. In addition to that, the government's closing argument, there's no allegation, and, in fact, we did not refer to any of the vouching or alleged vouching in closing argument. This Court's precedent makes a point of noting when the government rehashes the vouching, it's much more damaging. Here we did not do that. There were limiting, there were the typical jury instructions given by the Court both before the trial and after the trial about considering very carefully the testimony of cooperating witnesses. You know, that has been presented by you as a curative instruction. But it doesn't, it only indirectly goes to vouching. It basically just says, you know, be careful with the witnesses and look them over. It doesn't say, do not make any inferences that the Court approves of this. So there's curative instructions and there's curative instructions. And these are not as fully curative as they might have been. Well, this is a pattern instruction. And this is the same instruction that this Court in the Parker case, the Das case, the Nekachia case has cited as assisting in overcoming any potential prejudice. Now, it's certainly not alone sufficient, but coupled with the rest of the points I'm making and especially the overwhelming evidence here. More thorough instruction might have been more curative, but it also might have rung the bell more loudly about what was perhaps going on. Well, that's true, Your Honor. And, of course, had an objection been made, especially as to the wiretapping issue, a curative instruction could have been designed and given by the Court, but that opportunity was not provided. If I might direct the Court's, I'm sorry, Your Honor. Do you want to talk about Count 5? Oh, sure. The sufficiency of the evidence on Count 5? Yes, Your Honor. Of course, we're here on the standard that the government gets the benefit of all reasonable inferences from the evidence. Really? And as to Count 5. You sure about that? Sorry, Your Honor? You sure about that? I am sure about that, that we get the reasonable inferences from the evidence. Okay, good. And I think the evidence was very solid on this case. You have the phone call. Was very what? Solid on this count, Your Honor. Okay. Tell me about it. Well, the primary evidence was the phone call between Brooks and Rosales. Okay. What did the phone call say? Well, first let me say that this was viewed in the context of their entire relationship, their other drug trafficking activities, all their other phone calls. But this specific... You know, whenever lawyers say stuff like that, I know they haven't got the goods. Oh, no, Your Honor. I think we have the goods here. All right. This specific phone call... Why don't you just go to the goods? I will. You know, saying, oh, you got to do this in context. You know, just tell me what you got. In this call, Alfonso Brooks asked Jaime Rosales. He said he had an emergency. He needed any little thing, whatever you have. One drug dealer to another asking that question. Rosales responds that he has a corner, an esquina in Spanish. Now, the testimony at trial established, and we've talked about the hydraulic press, that cocaine, and specifically the cocaine that these defendants trafficked in, came in bricks. And we're talking about a corner during this call. Okay. There's... I'm sorry. What does that have to do with bricks? Well, Your Honor, one inference from that call is that a corner could be a corner of a brick. It could also be a corner of a straight. It could be. It could also be a corner of a croissant, you know. It could be anything at all. And that was exactly the closing argument. There was no evidence saying that the Spanish word esquina had any reference to drugs. There was no... Yes, Your Honor. That's correct. And that's the closing argument that Defendant Rosales made at trial. Okay. Now, what followed from that call, however, was a meeting that was observed by a law enforcement officer who testified. He observed a hand-to-hand transaction, and he observed Rosales handing Brooks a red bag that had an object in it, that the officer was able to make out the outline of that object, and it looked like an oblong softball. And this officer, who had been on the job for I think it was 12 years, a very experienced drug investigator, provided testimony that he knows what a quarter kilogram of cocaine, approximately what size that is. And he described that as an oblong softball. No, he doesn't. He says approximately the size of an oblong softball. He doesn't even say the shape. And you couldn't tell whether the object in the bag was wrapped or anything of that sort. It could have been a melon, for all we know, or an apple. Well, it could have been. It could have been cash for sure. I mean, let's say he was paying somebody off for a drug deal. It could have been a wallet of cash. Your Honor, it could have been a lot of things, and that's the argument that Rosales made at trial. But when the jury convicted on this count… Well, that's because the jury's got to have a rational basis for including it's one or the other. Sure, and I guess that gets back to the point that you didn't want me to… Maybe it's a corner of money. Maybe a corner refers to cash. I don't know. Well, at trial, that was an argument that Rosales made. But on this record, you have Rosales and Brooks a few months later or a few weeks later talking about half a kilo. And you have them constantly talking about drugs. Do they refer to half a kilo as a corner? Not in this call. In any call? Is there any call where half a kilo is related to the corner? Is there any evidence that suggests corner has to do with drugs rather than money? Drug dealers, of course, can also talk about money, right? Sure, and there is a call. Drug dealers can also talk about things unrelated to drugs. Right. To answer your question, yes, there is a call, and it relates to count six, which is another count relating to Rosales. This is the incident where they got the bad cocaine and returned the bad cocaine to the other group. And during one of the… I'm sorry, the bag that you now claim is cocaine? No, bad cocaine. Oh, the bad cocaine. This is a separate incident, the whole series of calls. Okay, got it. Okay, yeah, okay. And during the course of that incident, the other group that supplied the cocaine to Rosales uses the term corner in describing the cocaine. So, yes, there was additional evidence that the word corner is associated with cocaine. But I don't think the… I missed that. What exactly? How did that go? Do you have it? Can you read it to me? Yes, I will. You don't have to know where it is in the record, do you? I will, Your Honor, in a moment. I just need to find it first in my brief. Maybe I can address that in my rebuttal, Your Honor, because the site is in our brief, but just take me a moment to find it. Okay. And I will do that. But I would like to turn the Court's attention to our cross-appeal. And this, again, this relates to Defendant Rosales. What do you do with Blanton? Sorry, Your Honor? What do you do with Blanton? Well, what I do is distinguish Blanton. And then I think quite easily… First of all, I would note that this argument may very well have been waived by Rosales by not raising it before yesterday at 4 o'clock. But I would like to distinguish the case. Blanton… If it's jurisdiction, it's jurisdiction. Again, I don't think it's jurisdiction. I think the issue is the double jeopardy and whether, in fact, we would be able to pursue or appeal back down below the second time. But Blanton… What is the date of Blanton? I'm sorry, Your Honor? The date of Blanton? Oh, Blanton is… Well, now, you know… Cited in February… February 12, 2007. That's correct. Okay. Let me address the case, Your Honor. I see where you're headed. Blanton… The general rule, of course, is that double jeopardy does not apply in a sentencing context. Now, and that's the Monge case from the Supreme Court. Blanton found that that rule was not applicable in that case because the prior conviction that was at issue was a non-jury juvenile adjudication. The entire analysis that followed in Blanton flowed from that fact, that it was a juvenile adjudication. That is not deemed a prior conviction under Apprendi. It is not included in the exception under Apprendi for prior convictions. And so that, in the Blanton case, it had to be proved to a jury. In that case, the judge is backfired beyond a reasonable doubt. The court then, because of that, applied Velasco Heredia, which bars the government from proving an Apprendi fact the second time around at a sentencing that it failed to do the first time. And the court found that in Blanton, double jeopardy barred the appeal. We don't have that here. The conviction that the government relied on is an adult conviction. It was proven… Well, it was admitted to. It was a plea in court, an adult conviction in the state of Washington. That is part of the… I'm sorry. Juvenile adjudications don't apply to – don't apply to – I'm sorry. I'm sorry? Priors. It's Ty. T-I-G-H. Ty? The – the – the… The Ty case. Ty. Ty held that juvenile adjudications are not considered prior convictions for purposes of Apprendi. In other words, they're not – they're not exempt from proof to a jury beyond reasonable doubt, as typical prior convictions are. Well-reasoned but controversial decision. Well, it is, Your Honor. And I would note that the government actually has filed for a rehearing on Bonk and Blanton. And that was filed two days ago. Thanks a lot. Well, I didn't do that. But in any event, you know, assuming Ty for purposes of this argument, assuming Ty is obviously good law, Blanton applied that. We don't have that in this case. This is an adult conviction. This is not an Apprendi issue. Blanton is just not applicable here at all. What happened here is that the court – the court erred. You have a conviction and a judgment indicating possession of cocaine. Clearly, in the text of the statute, the maximum sentence is five years. The reasons the court gave for not enforcing this prior conviction do not hold water. The discrepancy – the court pointed out to an alleged discrepancy that really doesn't exist in the facts. There were – the documents make clear apparently there were two bags. One tested early on in the field as methamphetamine. Later, one tested in the lab as cocaine. And in any event, the distinction is meaningless and certainly not constitutionally relevant because the statute in Washington doesn't distinguish between the drugs and the element of the offenses don't include the drugs. And the court's reasoning that Washington State somehow treats this like a misdemeanor, albeit classified as a felony, is inconsistent with all of this court's rulings on this issue, including most recently the Perry case, which I provided in a Rule 28J letter. I believe that was decided about three or four weeks ago. And in a variety of contexts, this court has held that when we look to define what the maximum sentence is, we look at the statute, not the guidelines, and not the actual sentence that was imposed. So because of that, the court erred, and I'd like to reserve the remaining time for rebuttal. Just to make sure I understand what Blanton – Your position on Blanton is that it is limited to a situation where the matter would have to be heard by a jury. Yes, Your Honor. Where a defendant would be entitled to a jury if he chose to have one. Yes, Your Honor. He didn't, in fact, in Blanton have a jury. He raised a jury and went to the bench for that decision. That's correct. Always a mistake on the defendant's part, I think. Okay. I have two minutes. I wish I had more. It's like life itself. Isn't that true? There they go. Judge Fischer, is there a question? No. All right. I wouldn't want to take up your time. I think this is barred by the Blanton case. And the reason is that the district court acquitted Mr. Rosales on the enhancement that was embodied in the separate enhancing information that we litigated extensively. She did not make a legal ruling. No, if you read Blanton that broadly, then there could never be a government appeal from an adverse-sensing decision because the judge makes all these decisions, some of which are fact-based. And you say, well, okay, there's no appeal. That's certainly not the law. Certainly a defendant has no vested interest in an unlawfully low sentence that does not result from a separate statutory enhancing factor. And that's what we have in Blanton. Just like in this case, in Blanton it was three priors. Two of them were knocked out. The judge found the enhancements don't apply. Here we have only one prior. The judge knocked it out, rightly or wrongly. That's an acquittal. And I think it may go back to the Ogle case that's relied on heavily in Blanton, which I didn't cite in a Rule 28J letter. But that case did not appear, from looking at the Blanton opinion, to involve a prior juvenile conviction. So I really question this distinction the prosecutor is trying to draw between an enhancing factor that's a juvie conviction and one that's not. Ogle wasn't a sentencing case, was he? Ogle wasn't a sentencing case, if I remember correctly. That's correct. So it doesn't really help you any. Ogle was a plain old vanilla trial on the mayor's acquittal or dismissal of the charges after the government put on its case. Correct. There was nothing. Yeah. But in this case, like Blanton, we do have an enhancement that was charged separately that doesn't apply unless predicate facts are proven. What the district judge did was to find that those facts did not exist. So to give the government another bite at the apple and send the case back for resentencing would expose Mr. Rosales to double jeopardy. I wish I had time to address the statutory interpretation issues. We'll give you a minute to do that. All right. You each get a minute or two, if you wish. I'll pass the issue of whether the judge acted properly to raise this sua sponte. I think that's covered by the Redondo-Limos decision, which Your Honor wrote, Judge Kuczynski. A long time ago. It's still good law. Well, Redondo-Limos, and let me take up a lot of your time, but Redondo-Limos dealt with prosecutorial misconduct. Correct. But it demonstrates that the district court is not just a passive observer of what is going on and should take it. We didn't have a five-year statutory bar in that case. But I asked the court to consider this hypothetical. Let's say you have a defendant who's facing a doubled mandatory based on a prior foreign conviction which would permit a doubled mandatory for drugs. Let's say it occurred in Malaysia, and it's undisputed, it's 10 years old, it's undisputed that he was tortured, denied counsel, and there are very serious doubts about the validity of that conviction. Would a district judge be unable to raise that sua sponte? I think not. I don't think that's the law. We trust our government not to press a case like that. Well, anyway, you're time is up. Now, on the merits, I want to be heard on the statutory interpretation point because I know there are circuits, a number of circuits, that have ruled against me on this point. This has never been addressed by the Ninth Circuit. And I think if the court goes to the merits here, it ought to look at the issues that are raised in my brief in terms of the construction of the statute and the results that flow from a literal application of the words of the statute. In this case, we are talking about a series of amendments that occurred over a decade or more in which Congress sought to fill a gap in federal sentencing law by including state court convictions as predicate felonies that would have the effect of doubling the punishments. When they adopted the amendment that included state and foreign convictions, there were no mandatory minimums. There was no need to look carefully at the impact of expanding the scope of the statute because a district judge could take care of it at sentencing. If somebody had a misdemeanor type or let's say a simple possession type conviction, the court could go ahead and impose sentence accordingly and take that into account. The mandatories were introduced two years after the scope of prior felony conviction was expanded. The second factor that leads to what we submit is an unintended and absurd result is the fact that in 1988, I believe, Congress adopted a three strikes you're out provision for third time offenders. That provision is triggered by the same types of convictions that apply in this case. So you could have a situation where a person with two simple misdemeanors, simple possession misdemeanors under Federal court Federal law, is subjected to a mandatory life sentence without possibility of parole. Given the structure of the Act which provides for far more serious penalties for traffickers than it does for simple persons who are users, simple possessors, we submit that's not intended. It is in my brief. We do understand the argument. Thank you. Let me give each of your co-counsel a minute. Let's keep it for a minute. Thank you, Your Honor. On the vouching issue, I would like to note that the record shows that it was the United States Attorney who inserted the approval of the Federal Judge into the system, the testimony about obtaining the wiretap authorization. It was the prosecutor. It is certainly troubling and it's certainly troubling that Assistant United States Attorneys do that. And it is certainly it is also troubling that the United States District Judges allow it to happen and it is also troubling that defense lawyers sit there like potted palms and don't say anything about it. This does not bestow I assume you were not trial counsel. I was not trial counsel. I'm going on an assumption. But it really is troubling that that kind of stuff happens and nobody pays attention. You've got three defendants and you've got the government. What do we do about this? It's very hard to scramble eggs like this. This is obviously a heavy investment on the part of everybody involved, the court, the United States, and frankly paying defense lawyers for a trial like this. It's a huge societal investment. We have to sit here and scramble and try to figure out what effect this had on a jury. I think it has substantial effect. Why shouldn't we just say look, if it was so darn plain, why didn't somebody in that courtroom figure it out? Your Honor, I wasn't there and so I can't offer an explanation for that. However, I believe it has been found to be plain error and even in Milan where they affirmed the conviction when there was a single question of did a judge here in Camden authorize the wiretaps? That was one single question, but the court warned that if the prosecutor had told the jury that the court thought the defendant was guilty, that it would be reversible error. In this case, the prosecutor told the jury that not once, but twice in incorporating the approval of the judge assigned to this case just like the judge in this trial. The government in this case has acknowledged that the evidence was regrettable and we would ask this court to also find that it's reversible. It simply so permeated the case that the jury had no choice but to consider it. Thank you. Thank you. Judge Kaczynski, I think I neglected to answer a question of yours. It was having to do with why can't the sentencing judge just look at the guideline calculation, determine whether it was correct and impose the sentence and all I wanted to say was that I believe that post-Booker the judge has a greater duty than that which is to apply all the 3553A sentencing factors. I also wondered if the court had any questions about the standard of review. I don't think that was quite my question. My question was why couldn't the judge entirely determine what the guidelines range is take into account the fact that your client didn't do what he was required to come up with two points and the answer is he can't. Can he then go back and say, well even though he didn't do it, I'll give him credit for it in doing the 3553A calculation. I suppose he could. I don't know that there would be an abuse of discretion but why is there abuse of discretion in not doing that? Because the judge is charged with imposing the sufficient but no greater than necessary sentence and once the judge says you know you can interpret it a different way. He certainly did not say had you done this I would have gone down. He just said I'm surprised you didn't take advantage of this to get your numbers down. Now it's entirely possible a number could have gone down and the judge would have gone up from there. I mean we don't know. The only advantage though of The judge never said I would have given him a lower sentence. No. We don't have that clear cut of a case but we have a clear enough case to show a breach because what the judge says was I don't know why you didn't take advantage of this. The only advantage was a 78-month sentence. That's all that was on the table. That's all any of the parties were talking about. And the clear inference is that she would have imposed a 78-month sentence. Any questions about the standard of review? No, no. I think we understand the standard of review. Thank you. Counselor explained it very well. Your Honor, I have not found my second reference to Korner. I know it's in our brief but I have found a very similar site in the record for the court where Rosales and Brooks were on the phone. This is the conversation where Rosales was telling Brooks about his negotiations with another drug dealer and he said that that other drug dealer would have to give him half a kilo for his Jeep and in that same conversation he said but he'd have to give me a square for the Carmen Dia and the inference being half a kilo for the Jeep and a full square for the nicer car. I don't get it at all. What does it have to do with Korner? Well, you may disagree but I think Korner when we're talking about expert testimony of bricks, of cocaine. Do we have expert testimony saying this is the lingo and Korner means that and brick means that and square means that? No, the district court didn't allow that but we do have expert testimony about the fact that cocaine comes in bricks. These defendants, in fact, Rosales personally possessed the press with the kilo brick molds and I think the jury the point is the jury drew a reasonable inference. And even now as I stand here I have no idea where the Korner is. Sorry? Even as I stand here I have no idea where the Korner is. Well, the jury concluded based on reasonable based on the evidence a reasonable inference they concluded that a Korner was cocaine. And on this record that is a... How much cocaine? Well, as to count five it didn't matter because there was no quantity charged and that's the count with the term. Did you hear my question? You asked me how much cocaine? Well, my answer based on the testimony is a quarter kilo but as to count five which is... Why a quarter kilo? Because the officer that observed the deal saw the object in the bag and testified that it was the same size as a quarter kilo of cocaine and that's the evidence. So a Korner is a quarter of a brick? Yes, Your Honor. That was the government's argument and the jury agreed with it based on the evidence it's a reasonable inference. Were you the trial counsel? Yes, Your Honor. Why did you vouch? Why did I vouch? Yeah. Well, Your Honor, the only... There's nothing funny about it. No, I'm not smiling at least. Your Honor, the only vouching that we concede is in this record is the question that was asked to Soriano about his prior testimony. You think asking them about the wiretap and saying a federal judge just like this federal judge approved the wiretap you think that's okay? Your Honor, I don't think it's vouching and two circuits agree with that. In fact, two circuits have held specifically that there was no error at all. Seven circuits very clearly said why do you guys do stuff like that? You've got all this evidence. You've got tons of evidence and you just make problems for us and for yourselves by just stepping over the line. Well, I can answer the question why we did it because Alfonso Brooks unlike in Cunningham and unlike every one of these four cases that have addressed this, Alfonso Brooks objected to the admission of the wiretaps. He did not stipulate to the authenticity of the you then have to bring in evidence about how it was approved by high level people in the Justice Department and by a federal judge just like this federal judge. Your Honor, I don't think that that was strictly necessary to do that. In hindsight, I appreciate Why shouldn't we give you a chance to go back and do it right? Well, Your Honor, because See, this is the kind of problems you buy yourself when you push the envelope like that. It's just unnecessary. We see it in case after case after case and I would point to the court, point out to the court that this was perhaps three minutes of testimony over the course of a month long trial. This was not a highlight of the trial by any means. It was essentially the equivalent of you know Right, but see the problem is I wrote an opinion in Hermann Act which involved a big Oakland drug thing. We wrestled in that case for hours of judicial time and attorney time because there was vouching there too and it's in these drug things and I echo what Judge Kaczynski said I thought you'd done a marvelous job here today so I'm not criticizing I think you've been remarkably candid but there is a temptation at some point because we found it harmless in that case at some point to say look we write it, we say the Seventh Circuit was not forgiving at all in Cunningham and said look if you don't get the message it may be only three minutes but what you all do when you vouch when you invoke the authority of the U.S. Attorney in Hermann Act he was invoking his own participation in the investigation you then invoke the you know the imprimatur in effect of the trial judge the district judge and I thought Soriano just went over the edge beyond belief I just think it may be only three minutes but if you're sitting on a jury and you've got the government and then you've got the judge being brought in and then the U.S. Attorney himself and all of that better to all stop and think whether it's this case or the next case we're going to run out of patience on it if the government doesn't pick up on it I agree with Judge Fisher that your performance here today has been very my concern is that does an affirmance just send the message that such conduct can continue well your honor I would again emphasize that two circuits have found that this wiretap isn't even vouching or error at all the seventh circuit disagrees this court may disagree but on a plain error standard no court has reversed a conviction for this issue and certainly not with the overwhelming evidence that we have of guilt in this record thank you I'd like to compliment all counsel we've had a long week and the it's nice to end on a note of really all confident counsel I join the convoluted case with different issues and clients and we'll prevent it cases are you'll stand to move we are adjourned
judges: Kozinski, Fisher, Guilford